**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Scott KUIPERS, Defendant–Appellant.**

No. 94–2676.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 25, 1995.

Decided March 3, 1995.

Barry Rand Elden, Asst. U.S. Atty., Matthew C. Crowl (argued), Office of U.S. Atty., Crim. Receiving, Appellate Div., Chicago, IL, for plaintiff-appellee.

Thomas J. Organ, Raymond P. Cisco (argued), Cisco & Organ, Chicago, IL, John A. Lundquist, Lundquist & Associate, Bloomingdale, IL, for defendant-appellant.

Before FLAUM, EASTERBROOK, and MANION, Circuit Judges.

FLAUM, Circuit Judge.

The two thousand remaining Desert Bighorn Sheep, though (and perhaps because) highly prized by hunters, are a protected species in Mexico and the United States. Mexico offers a limited number of hunting permits for the sheep, but Scott Kuipers, a taxidermist, bypassed the process and bagged a sheep on his own. In the course of illegally transporting the hide and horns of the sheep to the United States, Kuipers presented phony documentation to U.S. Customs agents. These actions violated 18 U.S.C. § 545, as well as various provisions of the Lacey Act, 16 U.S.C. §§ 3372–3373. A jury convicted Kuipers, and he received a six-month prison sentence. Kuipers appeals the guilty verdict, claiming that the evidence was insufficient to sustain the conviction, and that the use of 404(b) evidence was reversible error.

Desert Bighorn sheep weigh about 200 pounds, and the large spiral horns, coveted by hunters, can weigh as much as forty pounds. The sheep are a protected species, and cannot be legally killed in Mexico without a hunting permit, obtainable only through a lottery. Of the two thousand extant, only fifty are males with horns that approach trophy status.

In October, 1988, Scott Kuipers and a fellow hunter, Ronald Brunsfeld, arranged a Mexican Desert Bighorn Sheep hunt through an Arizona booking agent named Fred Romley. The two each paid Romley $5,000 for a hunt, with an additional $2,500 to be paid upon killing a sheep. The checks were marked "Deposit for sheep hunt starting April 1, 1989. Balance of $2,500 on the kill."

In March, 1989, Kuipers and Brunsfeld flew to Hermosillo, Mexico and met with Manuel Garcia–Puebla, who acted as a supplier and a translator, and with two guides, including a Mexican game warden. Neither Kuipers nor Brunsfeld were given or shown a hunting permit; no one represented to the two that any permits had been secured for the hunt. The party drove to a camp, where they spent the night; the next day the party split into two groups to hunt. Kuipers and one guide climbed into the mountains, and the other three hunted nearby.

When Brunsfeld, Garcia, and their guide returned to the camp at the end of the day, they saw a dead Desert Bighorn Sheep, and watched Kuipers skin the sheep and prepare the hide for mounting. Brunsfeld saw the skull and horns near one of the tents, and could tell it had been freshly killed. Brunsfeld congratulated Kuipers, who told Brunsfeld how he saw three sheep and shot the largest of them twice. Kuipers told Garcia that he wanted to take his trophy with him back to the United States, and asked for documents that would let him do so. Garcia told Kuipers that he did not know if there were documents, but would check.

During the trip, Garcia steered the party away from locals to avoid drawing attention to the illegal hunt. This included the highly unusual tactic of moving camp in the middle of the night, something that happened twice. The hunt was done with rifles owned by one of the guides, because the hunters did not have the required gun licenses for Mexico.

Later during the hunting trip, Kuipers and Brunsfeld shot some javelina, a type of wild pig. This was done both without the required license and outside of hunting season. Kuipers indicated that he wished to transport the javelina back to the United States, but Garcia told him they had no licenses for the javelina, but that they could be purchased when the upcoming season started.

When the hunters returned to Hermosillo, Garcia told Kuipers that there was a document issued under the name of Fred Romley which Kuipers could try to use to transport the sheep parts back into the United States; he warned Kuipers that there were no docu-

ments issued in Kuipers's name. Kuipers expressed concern about this, but told Garcia that, to avoid suspicion, he could always tell authorities in the United States that he was simply the taxidermist for the animal.

Garcia then gave Kuipers a document written in Spanish purporting to give Fred Romley permission to transport a Desert Bighorn Sheep into the United States. The document was irregular: it did not resemble the non-resident hunting license required for an individual to export a Desert Bighorn Sheep from Mexico; it was not issued in the name of the hunter; it was signed by an official who had long before been fired from the Mexican government. Kuipers accepted the fake document without protest. At the end of the hunting trip, Kuipers paid Garcia the additional $2,500 required for killing the Desert Bighorn Sheep, and boarded the airplane with a duffel bag large enough to carry the horns and hide.

Kuipers and Brunsfeld flew from Hermosillo to Tucson. At Customs, Brunsfeld saw Kuipers declare a set of sheep horns, which he claimed were a "pick up" set that he had found (as opposed to from an animal he had shot). Kuipers completed a U.S. Fish and Wildlife declaration form, certifying that he was importing a "pick-up skull" and 'a salted hide, and representing that he had an export permit for the wildlife. Kuipers provided with the form the phony letter in the name of Fred Romley that Kuipers had received from Garcia.

On March 31, 1989, Kuipers shipped the full-mount hide of a Desert Bighorn Sheep for tanning, and it was tanned and shipped back to Kuipers's taxidermy shop on April 28, 1989.

Tucson U.S. Fish and Wildlife Agent Greg Stover eventually received the declaration and permit several days after Kuipers returned to the United States, and noticed that the "permit" was fake. Stover mailed a letter to Kuipers requesting an original permit, but got no response. On May 5, 1989, Stover phoned Kuipers asking for additional documentation; Kuipers said he had none, and that the sheep was Fred Romley's. Kuipers insisted that the horns were "pick-up" horns and that he had killed nothing during his trip

to Mexico. Kuipers would not even acknowledge that he had gone to Mexico on a hunting trip. Stover asked Kuipers for an address or telephone number for Romley, and eventually Kuipers conceded that he would try to get in touch with Romley and re-contact Stover. Stover told Kuipers the purported import permit was fraudulent, and asked Kuipers to abandon the horns and hide to the U.S. Fish and Wildlife Service office in the Chicago area.

On May 10, 1989, Kuipers abandoned the horns to the Chicago office of the U.S. Fish and Wildlife Service, stating to Agent Joe Budzyn that the horns were a pick-up set of Desert Bighorn Sheep horns from Mexico that he had imported through Tucson. Kuipers signed a form agreeing to abandon the horns to the Service, but never made a mention of the hide to anyone.

Kuipers was indicted on March 1, 1994 for (1) knowingly submitting false records for importation of a Desert Bighorn Sheep from Mexico (16 U.S.C. §§ 3372(d), 3373(d)(3)(A)); (2) fraudulently and knowingly importing the Desert Bighorn Sheep into the United States contrary to law (18 U.S.C. § 545); (3) knowingly importing, transporting and receiving the Desert Bighorn Sheep possessed and transported in violation of law (16 U.S.C. §§ 3372(a)(1), 3373(d)(2)); and (4) knowingly possessing the Desert Bighorn Sheep contrary to the provisions of the Convention in International Trade of Endangered Species ("CITES") (16 U.S.C. §§ 1538(c)(1), 1540(b)(1)). Kuipers pled not guilty.

On April 19, 1994, Kuipers's jury trial began. The government closed its case two days later. Among its witnesses was Agent Richard Dickinson of the U.S. Fish and Wildlife Service. Dickinson had inspected Kuipers's taxidermy shop in 1986, and found numerous violations of record-keeping requirements. Dickinson testified that he told Kuipers that Kuipers had sold illegal wildlife to undercover state and federal officers. Dickinson stated that Kuipers told him that wildlife was only kept in one room, but that wildlife was found in three rooms. Dickinson testified that state officials seized business records and wildlife that had not been

"tagged" so a conservation officer could determine if it had been lawfully taken under a state license. Among the untagged animals was a member of a protected species, the bobcat. On cross-examination, he testified that three recordkeeping violations were brought against Kuipers in federal court, but were dismissed upon his recommendation because of Kuipers's cooperation in another federal investigation. There were four state citations, two of which were dismissed, and the other two resulted in a small fine and a sentence of supervision after a plea of guilty. Garcia and Brunsfeld also testified against Kuipers.

Kuipers presented no evidence, and the jury convicted him on three of the counts after brief deliberations. The jury acquitted Kuipers of the CITES violation.

Kuipers filed a motion for a new trial, challenging, among other things, the sufficiency of the evidence and admission of other acts evidence pursuant to Federal Rule 404(b). The district court denied the motion, and, on July 6, 1994, Kuipers was sentenced to six months' incarceration, followed by two months of home confinement and three years of supervised release. Kuipers was also fined $10,000. Kuipers filed a timely notice of appeal on July 14, 1994, and we consider his claims now. Finding no error, we affirm.

In reviewing a claim of insufficient evidence, the court must consider the evidence in the light most favorable to the government; the verdict should be reversed only if the record contains no evidence from which the jury could find guilt beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Herrera–Rivera,* 25 F.3d 491, 498 (7th Cir.1994). Here, the evidence is more than strong enough to support a guilty verdict. The jury was entitled to believe the testimony of Garcia and Brunsfeld. *United States v. McFarland,* 37 F.3d

1235 (7th Cir.1994). Kuipers argues that a government expert, Bonnie C. Yates, was unable to testify with certainty that the sheep skull presented at trial was from a Desert Bighorn in Mexico rather than a Rocky Mountain Bighorn from the United States. But the jury was entitled to believe Kuipers's own admission to the Fish and Wildlife Service about the nature of the skull.

Requiring slightly more analysis is Kuipers's appeal regarding the admission of Dickinson's testimony. The government, in compliance with Rule 404(b),* filed a motion *in limine* to introduce Dickinson's testimony. Kuipers failed to file a response, and the district court granted the motion in a thorough memorandum opinion and order. At trial, Kuipers moved to reconsider, arguing that the evidence was "highly prejudicial", "irrelevant" and being introduced for "no purpose other than to show that Mr. Kuipers is somehow a bad person". The district court rejected this approach, responding:

> The proffer was made by the government under Rule 404(b) to establish Mr. Kuipers' knowledge and intent in this case. And knowledge and intent seem to be the crux of what the case is all about. According to your opening statement and the cross examinations you've conducted this far, it is knowledge and intent by Mr. Kuipers that you are contesting, not the acts of transporting these horns and skins from an endangered species into the United States.

> So I find that the evidence is highly probative. Whether or not that would indicate that on prior occasions Mr. Kuipers knew and had knowing possession or was on notice of other endangered species or species that required tagging and licensing or other government regulations does not require a conviction; it requires the proffering of reliable evidence from which a jury could find by a preponderance of the

---

* Fed.R.Evid. 404(b) reads:

   **(b) Other crimes, wrongs, or acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

evidence that Mr. Kuipers committed these other acts, which would show knowledge and intent on his part, that he was not a novice when it came to dealing with these kinds of animal hides and skins.

So I do find that the evidence is highly probative of intent, knowledge, and shows the absence of mistake or accident, as I believe you suggested to the jury was your defense.

Limiting instructions were given to the jury at the time of Dickinson's testimony more than once.

■■■ On appeal, Kuipers raises for the first time the claim that he never put his intent at issue; his stance at trial was that the horns were not those of a Desert Bighorn sheep and that they were a "pick up." Kuipers also argues for the first time that the acts presented below were insufficiently similar to the crime with which he was charged. The arguments that were waived below can only be reviewed for plain error, "plain" meaning "egregious." *United States v. Caputo*, 978 F.2d 972, 975 (7th Cir.1992). The arguments that were preserved are reviewed under an abuse of discretion standard. *United States v. Beasley*, 809 F.2d 1273, 1278–79 (7th Cir.1987).

■■■ This circuit uses a four-part test for admitting evidence under Rule 404(b). The district court must determine that "(1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue, (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice." *United States v. Maholias*, 985 F.2d 869, 879 (7th Cir.1993).

■■■ Evidence of past bad acts is inadmissible as proof of a defendant's character and propensity to commit crimes, but under certain conditions it is admissible as proof of an element of a crime, such as a defendant's intentions: it can help show that his behavior was purposeful rather than accidental, since accidents usually are not repeated. Fed. R.Evid. 404(b); *Beasley*, 809 F.2d at 1278. While Kuipers may or may not have put intent at issue, the crimes charged required the government to prove a *mens rea* of "knowingly," and the Seventh Circuit has held that in such cases, 404(b) evidence always will be at least relevant. *United States v. Liefer*, 778 F.2d 1236, 1243 (7th Cir.1985); *United States v. Chaimson*, 760 F.2d 798, 805 (7th Cir.1985). Kuipers's claim at oral argument that he was not charged with crimes of specific intent directly contradicts the language of 18 U.S.C. § 545.

An additional requirement for admissibility is that the 404(b) acts be sufficiently alike and close in time to the crime charged. Here, both involved illegal possession of protected species of wildlife, albeit a bobcat rather than a Desert Mountain Sheep. The similarity is also easily discernible between Kuipers's failure to tag animal parts adequately and his failure to comply with documentation requirements for the sheep. The difference in the specific species is irrelevant for these purposes. *United States v. York*, 933 F.2d 1343, 1351 (7th Cir.1991). The three-year span of time is sufficiently close for the evidence to be admitted. *United States v. Goodapple*, 958 F.2d 1402, 1407–08 (7th Cir.1992). The decision was plainly correct on this account, rather than one of plain error.

■■■ The government prompted Dickinson to testify that Kuipers tried to mislead him during the search, telling him that wildlife could only be found in one room, when there was wildlife in two other rooms. At oral argument, Kuipers's attorney argued that this was reversible error. Kuipers failed to object to this testimony before or during trial. It is imperative that defendants notify trial judges of the nature of their objections at trial, when possible errors can be addressed and rectified. A defendant cannot squirrel away objections, revealing them only upon successive appeals. As with all waivers, plain error must be shown. Perhaps if we were judges at the trial level below, we might have excluded testimony about that specific incident; then again, we cannot say that no reasonable judge would have admit-

ted it. Even if we were inclined to find error here, given the weight of the evidence against Kuipers, it is impossible for us to say that this particular piece of disputed testimony was of "such a great magnitude that it probably changed the outcome of the trial." *United States v. Stone*, 987 F.2d 469, 471 (7th Cir.1993).

As for the lower court's weighing of probativeness and undue prejudice, one is hard-pressed to find an error, much less an abuse of discretion, in the district court's decision to admit the evidence. Even if, as Kuipers now claims, he was relying on the hope that the jury would decide the sheep was not a Desert Mountain Sheep rather than a finding that he lacked intent, the prosecution still needed to show that his illegal importation was the result of more than just a poor choice of tour guides. Admitting the evidence was well within the bounds of the trial judge's discretion, and any "undue prejudice" was minimized with a limiting instruction.

For the foregoing reasons, the judgment is

AFFIRMED.