**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Marco DAMICO, Defendant–Appellant.**

**No. 95–3594.**

United States Court of Appeals, Seventh Circuit.

Argued March 29, 1996.

Decided Nov. 8, 1996.

Barry Rand Elden, Chief of Appeals, John Burley, argued, Office of the United States Attorney, Criminal Appellate Division, Chicago, IL, for Plaintiff–Appellee.

Thomas P. Sullivan, William A. VonHoene, Jr., argued, David Jimenea–Ekman, Jenner & Block, Chicago, IL, Allan A. Ackerman, Chicago, IL, for Defendent–Appellant.

Before EASTERBROOK, ROVNER, and DIANE P. WOOD, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

In a detailed plea agreement, Marco Damico admitted that for approximately fifteen years, he headed a criminal enterprise that regularly engaged in illegal acts such as extortion, armed robbery, and the operation of gambling and bookmaking businesses. He pled guilty to a series of charges addressed to these activities, the most serious being a conspiracy to conduct the affairs of the enterprise through a pattern of racketeering activity and the collection of unlawful debt in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d). In furtherance of the RICO conspiracy, Damico also conspired to rob at gunpoint the participants in a card game scheduled to take place near Lake Geneva, Wisconsin in November 1989. He therefore also pled guilty to the charge of knowingly using or carrying a firearm during and in relation to a crime of violence, which

carries a mandatory consecutive prison sentence of five years. 18 U.S.C. § 924(c)(1). After accepting Damico's guilty plea, the district court sentenced him to a prison term of 147 months—87 months for the RICO conspiracy to be followed by the mandatory 60–month term for the firearm conviction. In this appeal, Damico raises three challenges to that sentence. After oral argument, moreover, Damico requested and received permission to file a supplemental brief addressed to the impact on his firearm conviction of the Supreme Court's intervening decision in *Bailey v. United States,* —— U.S. ——, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995). We now affirm that conviction as well as the sentence imposed below.

## I.

■ Count V of the government's superseding indictment charged Damico with conspiring to rob the participants in the Lake Geneva card game in violation of 18 U.S.C. § 1951. The government alleged that this conspiracy extended from October 3, 1988 to November 30 of the following year, and that Damico's primary co-conspirator in this endeavor was Robert M. Abbinanti. The indictment charged the conspirators with agreeing, at Damico's direction, that a .22 caliber handgun with a silencer would be provided to Abbinanti for use in the robbery. The indictment further alleged that Damico had discussed the robbery with government informant Robert Cooley, who apparently would be participating in the card game, and that in one of their conversations, Damico had stated that there would be no heroes once the card players were confronted with shotguns. According to the government, Abbinanti then traveled to Wisconsin with the silencer-equipped handgun on November 29, 1989, for the purpose of committing the robbery. For a variety of reasons, however, he never carried out the robbery. Count VI of the superseding indictment charged Damico and Abbinanti with violating 18 U.S.C. § 924(c)(1) by knowingly using or carrying the .22 caliber handgun with silencer during and in relation to the crime of violence (i.e., the conspiracy to commit robbery) charged in count V. (See R. 7 at 15–18.) Damico pled guilty to count V but not to count VI. He instead entered a plea of guilty to a one-count information also charging a section 924(c)(1) violation but. omitting any mention of the silencer. (R. 197.) That meant that the mandatory consecutive sentence required by section 924(c)(1) was reduced from thirty years (for a silencer-equipped firearm) to five years. *See* 18 U.S.C. § 924(c)(1).

. In a detailed plea agreement, Damico stipulated to many of the facts alleged in the indictment. He admitted, for example, that he had conspired with Abbinanti and others to commit the Lake Geneva robbery and that the conspirators had agreed that Abbinanti would use a firearm in the course of the robbery. (R. 203 at 10.) Damico further acknowledged that in planning the robbery, he had inquired of Cooley whether any of the card game participants would bring pistols to the game and then told Cooley "that there would not be any heroes when [they] saw the shotguns." (*Id.* at 11.) Damico agreed that his co-conspirators had then traveled to Lake Geneva and were prepared to commit the robbery as planned. He conceded, in fact, that Abbinanti had "carried" a firearm to Wisconsin for the specific purpose of committing the robbery. (*Id.*) In entering his guilty plea in open court, moreover, Damico acknowledged the accuracy of the facts to which he had stipulated in the plea agreement. (R. 224 at 31.) The district court found that these admissions provided an adequate factual basis for Damico's plea. (*Id.* at 33.) *See* Fed.R.Crim. P. 11(f) (court must satisfy itself of factual basis for a guilty plea).

Despite these admissions, Damico now asks that we vacate his firearm conviction and remand to enable the district court to consider whether a section 924(c)(1) violation actually occurred. That unusual request is prompted by the Supreme Court's decision in *Bailey,* which was released after the entry of Damico's plea below and after the filing of his opening brief here. The Supreme Court held in *Bailey* that a firearm is not "used" for purposes of section 924(c)(1) unless it is "actively employed" during and in relation to the underlying crime of violence. —— U.S. at ——, 116 S.Ct. at 509. The Court explained that "active employment" would include such acts as "brandishing, displaying, bartering,

striking with, and most obviously, firing or attempting to fire" the weapon, but would not encompass mere possession or storage, or the placement of the weapon nearby for later use, even if those acts served to embolden the defendant in committing the underlying offense. *Id.* at ———— ——, 116 S.Ct. at 508–09. By requiring that a firearm be "actively employed" to qualify as a "use," *Bailey* significantly narrowed the scope that this circuit had previously accorded to section 924(c)(1). *See, e.g., United States v. Gonzalez,* 93 F.3d 311, 318 (7th Cir.1996); *United States v. James,* 79 F.3d 553, 553–54 (7th Cir.1996). Damico now seeks to take advantage of *Bailey* to invalidate his earlier plea. Conceding that an adequate factual basis existed to support a statutory violation under our pre-*Bailey* law, he asserts that after *Bailey,* it is unclear whether the conduct acknowledged in the plea agreement still would violate the statute. For this reason, he asks that we vacate his firearm conviction and remand to the district court for further proceedings. *See United States v. Abdul,* 75 F.3d 327, 329–30 (7th Cir.) (vacating plea for knowing use of firearm where the admitted conduct would not constitute a "use" under *Bailey* ), *cert. denied,* — U.S. ——, 116 S.Ct. 2569, 135 L.Ed.2d 1085 (1996); *see also United States v. Robinson,* 96 F.3d 246, 254 (7th Cir.1996) (factual basis for guilty plea may be insufficient where government proffered only that the defendant "possessed numerous weapons" in connection with a narcotics conspiracy). After reviewing Damico's admissions in the plea agreement and at the plea hearing, however, we are convinced that *Bailey* does not undercut the factual basis for his plea.

The government alleged and Damico admitted that during and in relation to the robbery conspiracy, he caused Abbinanti both to use and to carry a firearm. Although he thus admitted to violating both the "use" and "carry" prongs of section 924(c)(1), a violation of either prong would be sufficient, for the statute is phrased in the disjunctive. In narrowing the scope of the statute's "use" prong in *Bailey,* the Supreme Court emphasized that conduct not rising to the level of a "use" may still fall within the separate "carry" prong. — U.S. at ——, 116 S.Ct. at

509; *see also United States v. Booker,* 73 F.3d 706, 709 (7th Cir.1996) (*Bailey*'s holding "does not limit the 'carry' prong of § 924(c)."). Indeed, the need to preserve some independent meaning for the term "carry" proved central to the Court's construction of a "use," for the Court found nothing to indicate that Congress intended the two terms to be redundant. *Bailey,* — U.S. at ———— ——, ——, 116 S.Ct. at 506–07, 509. The Court explained that:

> Under the interpretation we enunciate today, a firearm can be used without being carried, *e.g.,* when an offender has a gun on display during a transaction, or barters with a firearm without handling it; and a firearm can be carried without being used, *e.g.,* when an offender keeps a gun hidden in his clothing throughout a drug transaction.

*Id.* at ——, 116 S.Ct. at 507. Thus, although neither of the two defendants in *Bailey* had "used" a firearm in the active-employment sense, the Court remanded for consideration of whether their convictions could be upheld under the separate "carries" prong. *Id.* at ——, 116 S.Ct. at 509. Following that directive, this court has affirmed section 924(c)(1) convictions in the post-*Bailey* era where "the uncontested actions of a defendant clearly fit the definition of 'carry,' " even if they may not also qualify as a "use." *See Gonzalez,* 93 F.3d at 321 (discussing *United States v. Baker,* 78 F.3d 1241 (7th Cir.1996)); *see also Booker,* 73 F.3d at 709.

The government believes that is the case here, and unfortunately for Damico, we must agree. Not only did Damico generally admit to violating section 924(c)(1) both in his plea agreement and before the district court at the plea hearing, but he also acknowledged that in furtherance of the charged conspiracy, Abbinanti had "carried a firearm... for the specific purpose of robbing the card game in Wisconsin." (R. 203 at 11.) Thus, even if Damico may have relied on our pre-*Bailey* law in acknowledging a "use" of the firearm, he separately and specifically admitted that the firearm also had been "carried" during and in relation to the charged conspiracy. Damico does not suggest that in mak-

ing that admission, he relied on any expansive pre-*Bailey* interpretation of the statute's "carry" prong. As a result, Damico's admission provides an adequate factual basis for his plea. *See United States v. Barnhardt,* 93 F.3d 706, 710–11 (10th Cir.1996) (affirming conviction where defendant admitted at plea hearing that he "carried" a firearm during a drug transaction by tucking it into the back of his pants); *United States v. Rivas,* 85 F.3d 193, 195–96 (5th Cir.1996) (admissions at plea hearing sufficient to show that firearm was "carried"); *United States v. Riascos–Suarez,* 73 F.3d 616, 623–24 (6th Cir.) (government's proffer at plea hearing sufficient to establish that firearm was "carried" when placed by the defendant in the driver's side console of his vehicle), *cert. denied,* —— U.S. ——, 117 S.Ct. 136, 136 L.Ed.2d 84 (1996).

Damico nonetheless argues that because the record does not reveal precisely where the weapon was "carried," we should vacate his conviction to enable the district court to inquire further. Damico suggests that for all we know, the weapon was merely stashed in the trunk of Abbinanti's automobile, rather than within his reach inside the vehicle or under his clothing. According to Damico, the weapon would not have been "carried" under the firearm statute unless it was within Abbinanti's reach. *See Baker,* 78 F.3d at 1247 (holding that a defendant "carries" a weapon by transporting it in a car within his reach but reserving the question of whether a firearm locked in the trunk would also be "carried"); *see also United States v. Smith,* 80 F.3d 215, 221 (7th Cir.1996). Even if Damico is correct in anticipating how we might rule in a case involving a firearm locked in the trunk of an automobile, he should have considered that issue before admitting below that this weapon was "carried." There is nothing in the record to indicate that when Damico executed the plea agreement, he remained in the dark about where the firearm had been kept. If it was in the trunk, as Damico now suggests, then he should have refrained from acknowledging that the firearm ever was "carried." After all, the argument Damico now makes—that a firearm is not "carried" if only transported in the trunk of an automobile—was available under our pre-*Bailey* cases. *United States v. Edun,* 890 F.2d 983, 988 (7th Cir.1989), in fact, expressly reserved that question while noting the difficulties other circuits have had in delineating the scope of the statutory term "carries." *Cf. United States v. Ocampo,* 890 F.2d 1363, 1371 (7th Cir.1989) (defendant could be convicted of "carrying" a weapon that was hidden under automobile seat). Damico effectively waived the argument, then, by admitting as a background fact that his co-conspirator "carried" the firearm during and in relation to the underlying crime of violence. *See Edun,* 890 F.2d at 987–88 (defendant waived argument that firearm in vehicle's trunk was not "carried"). At the same time, that admission provides an adequate factual basis for Damico's plea.

## II.

### A.

■ Having dispensed with Damico's supplemental argument, we turn to the sentencing issues raised in his primary brief. Damico first contends that the district court erred in adding four points to his base offense level under U.S.S.G. § 3B1.1(a) to account for his leadership role in the racketeering conspiracy. That section authorizes a four level enhancement "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants, or was otherwise extensive." U.S.S.G. § 3B1.1(a).[1] Damico concedes that this enhancement would apply to his role in the overall RICO conspiracy but argues that because the base offense level applicable to that conspiracy was established via a cross-reference to the "underlying racketeering activity" (*see* U.S.S.G. § 2E1.1(a)(2)),[2] his role in the of-

---

1. Guideline references in this opinion are to the 1994 version, which was in effect on the date of Damico's sentencing.

2. Section 2E1.1 provides:
   **Unlawful Conduct Relating to Racketeer Influenced and Corrupt Organizations**

(a) Base Offense Level (apply the greater):
   (1) 19; or
   (2) the offense level applicable to the underlying racketeering activity.

fense must be separately judged with respect to each underlying offense. That argument is based on Application Note 1 to section 2E1.1, which provides as follows:

> Where there is more than one underlying offense, treat each underlying offense as if contained in a separate count of conviction for the purposes of subsection (a)(2). To determine whether subsection (a)(1) or (a)(2) results in the greater offense level, apply Chapter Three, Parts A, B, C, and D to both (a)(1) and (a)(2). Use whichever subsection results in the greater offense level.

U.S.S.G. § 2E1.1, comment. (n.1). Damico argues that when the procedure required by the application note is followed here, the four-level enhancement would not apply because the particular racketeering offense used in establishing his base offense level did not involve "five or more participants" and was not "otherwise extensive."

██ We generally review a district court's conclusion about a defendant's aggravating role in the offense only for clear error. *E.g.*, *United States v. Johnson–Dix*, 54 F.3d 1295, 1309 (7th Cir.1995). In this case, however, Damico argues that the district court misconstrued the relationship between sections 2E1.1 and 3B1.1 of the guidelines. His argument therefore raises an issue of guidelines interpretation that we consider de novo. *See United States v. Tai*, 41 F.3d 1170, 1174 (7th Cir.1994); *United States v. Ford*, 21 F.3d 759, 765 (7th Cir.1994).

Note 1 of the commentary to section 2E1.1 provides that where the underlying racketeering activity includes more than a single substantive offense, each such offense must be treated as if "contained in a separate count of conviction" for the purpose of applying subsection (a)(2). U.S.S.G. § 2E1.1, comment. (n.1). The parties agree that under this application note, the underlying racketeering activity in this case is properly divided into four offense groups: (1) the illegal gambling and bookmaking businesses; (2) the conspiracy to rob the Lake Geneva card game; (3) the extortionate extraction of

a street tax from and unlawful extension of credit to Robert Cooley; and (4) the extortionate extraction of a street tax from Richard Lantini. *See generally* U.S.S.G. § 3D1.2 (establishing grouping rules for related counts). Of these groups, the Cooley extortions produce the highest unadjusted offense level—a 20 pursuant to section 2E2.1(a).[3] The adjustments required by Chapter Three, Parts A through D, must then be applied to the subsection (a)(1) offense level of 19 and the subsection (a)(2) offense level of 20, with the subsection producing the greater overall offense level to be used in establishing the defendant's base offense level. U.S.S.G. § 2E1.1 comment. (n.1). Although the parties dispute how section 3B1.1 should be applied in this case, they ultimately agree that once the relevant Chapter Three adjustments are applied, subsection (a)(2) will produce the higher overall offense level. That is because only the subsection (a)(2) offense level will receive a four-level adjustment under section 3D1.4 to produce the combined offense level for the four groups of racketeering offenses. *See* U.S.S.G. § 3D1.4. Subsection (a)(2) must therefore be used to establish Damico's base offense level for the racketeering conspiracy. *See* U.S.S.G. § 2E1.1, comment. (n.1).

██ With that as a given, the parties dispute whether the particular adjustment for Damico's aggravated role in the offense should address his role in the overall conspiracy, or only his role in the specific predicate offense from which his base offense level is derived. Damico concedes that if his role in the overall conspiracy is considered, then he qualifies for the four-level enhancement given to "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." *See* U.S.S.G. § 3B1.1(a). Yet he argues that because subsection (a)(2) applies to his case, only his role in the predicate acts of extortion may be considered. Although a defendant's aggravating role is judged in relation to the

---

**3.** The gambling and bookmaking offenses are assigned an offense level of 12 pursuant to section 2E3.1, the conspiracy to commit robbery an offense level of 17 pursuant to sections 2X1.1 and 2B3.1(a), and the Lantini extortions an offense level of 18 pursuant to section 2B3.2.

offense of conviction and all relevant conduct under section 1B1.3 (*United States v. Lewis,* 79 F.3d 688, 691 (7th Cir.1996)), Damico asserts that the remainder of his racketeering conduct would not be considered relevant to the extortion related conduct here. Under Damico's view, then, the four-level enhancement was improper because the extortion-related conduct involved but one person other than himself.

We rejected an approach similar to Damico's in *United States v. Morgano,* 39 F.3d 1358, 1379 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 2559, 132 L.Ed.2d 813 (1995), observing that section 3B1.1's use of the phrase "criminal activity" is "broad enough to include the entire racketeering conspiracy rather than the particular predicate act alone." *Morgano* found support for this conclusion in the commentary to section 3B1.1, which instructs that " 'all persons involved during the course of the entire offense are to be considered' " in assessing whether criminal activity is "otherwise extensive." *Id.* (quoting U.S.S.G. § 3B1.1, comment. (n.2)).[4] The government insists that *Morgano* is controlling, but not so fast says Damico. He contends that *Morgano*'s focus on the broad phrase "criminal activity" in section 3B1.1 fails to answer the argument he makes here based on the commentary to section 2E1.1. He asserts, in other words, that *Morgano*'s approach is inconsistent with Application Note 1.

But Damico's argument does not account for the fact that section 2E1.1's sole purpose is to establish the *base offense level* for a RICO offense, not the adjusted offense level. By using the offense level that would apply to the underlying racketeering activity unless that offense level is less than the minimum base offense level of 19, the guideline "ensures that a RICO defendant will not receive a *lesser* sentence than would attach to the underlying acts, simply by virtue of his having committed them in furtherance of a racketeering scheme." *United States v. Butt,* 955 F.2d 77, 89 (1st Cir.1992) (emphasis in original). At the same time, however, the guideline also is designed to account for the fact that a particular offense used to establish the base offense level under subsection (a)(2) was committed in furtherance of a larger racketeering scheme. It does this through application of the Chapter Three adjustments to the base offense level that results. If Damico were correct that an adjustment like that in section 3B1.1 could be applied only to the predicate act used under subsection (a)(2), then a defendant convicted of organizing a far-reaching RICO enterprise could avoid the adjustment so long as that predicate act involved fewer than five participants and was not otherwise extensive. No account would be taken, then, of the fact that those participating in the isolated predicate act actually were acting in connection with a larger criminal enterprise. As we see it, however, section 2E1.1 was designed to take account of that fact.

Again, Damico points to Application Note 1, insisting that it requires the adjustments to be applied separately to each predicate act. But that note only requires the underlying offenses to be treated separately "for the purposes of subsection (a)(2)"—that is, only for the purpose of establishing the base offense level applicable to the RICO conspiracy. The note does not say that the separate treatment extends as well to application of the Chapter Three adjustments. Although the note indicates that the adjustments are to be applied to the offense levels generated under subsections (a)(1) and (a)(2), that is for the purpose of determining which subsection will ultimately apply. In short, we see nothing in section 2E1.1 or its commentary to indicate that an adjustment like that in section 3B1.1 should not be applied to a RICO base offense level generated under subsection (a)(2) in the same way that it would to any other base offense level—by looking to the count of conviction (the overall RICO conspiracy) and all relevant conduct within

---

4. We applied an earlier version of the guidelines in *Morgano.* Under the 1994 guidelines, the quoted language appears in Application Note 3.

the scope of section 1B1.3. *See* U.S.S.G. § 3B1.1, Introductory Commentary.

We hold, therefore, that the predicate-by-predicate approach of Application Note 1 applies, as the note states, only for the purpose of establishing a RICO defendant's base offense level, and not for the purpose of applying the Chapter Three adjustments. The district court, then, properly looked to the overall racketeering conspiracy in assessing Damico's role in the offense under section 3B1.1.

### B.

■ Damico next contends that the district court used the wrong criminal history category in determining his sentencing range. The court placed Damico in category III after assessing him four criminal history points—one point for a one-year sentence of supervision imposed on a 1984 battery conviction (*see* U.S.S.G. § 4A1.1(c)), one point for a one-year sentence of conditional discharge imposed on a 1989 reckless driving conviction (*see id.*), and two points because Damico committed the instant racketeering offense while under these sentences (*see* U.S.S.G. § 4A1.1(d)). Damico contends that the reckless driving sentence should not produce a criminal history point because under U.S.S.G. § 4A1.2(c)(1)(A), a sentence for careless or reckless driving is counted only if "the sentence was a term of probation of at least one year or a term of imprisonment of at least thirty days." The district court concluded that an Illinois sentence of conditional discharge is the equivalent of a sentence of probation for purposes of that guideline, but Damico insists that the two are distinct and that his reckless driving sentence does not qualify as a "term of probation."

Damico's argument, however, runs headlong into *United States v. Caputo*, 978 F.2d 972, 976–77 (7th Cir.1992), which held that an Illinois sentence of conditional discharge is to be equated with a "term of probation" for purposes of section 4A1.2(c)(1)(A):

> Probation means that the convicted defendant is not incarcerated but must comply with various conditions set by the sentenc-

ing court and monitored by a probation officer, such as periodic reporting, keeping out of trouble, and keeping clean of drugs. Conditional discharge is the same except that there is no probation officer, and in fact was introduced into Illinois law (we conjecture, with some support in Council Commentary, Smith–Hurd Ill. Stat. Ann. ch. 38 para. 1005–1–4, and Jay M. Hanson, "The Conditional Discharge—A New View in Misdemeanor Sentencing," 62 Ill. Bar J. 280 (1974)) as a way of coping with the shortage of probation officers. It is probation without the probation officer and that is a distinction without a difference so far as the purposes of the guideline exception is concerned.

*Caputo* also noted that the Sentencing Commission equates "unsupervised probation" with supervised probation under a separate section of the guidelines, and because we viewed "unsupervised probation" as the equivalent of conditional discharge, we equated a sentence of that type with supervised probation as well. *Caputo*, 978 F.2d at 977 (citing U.S.S.G. § 4A1.1, comment. (n.4)); *see also United States v. Scott*, 19 F.3d 1238, 1246 (7th Cir.) (also equating conditional discharge with probation), *cert. denied*, —— U.S. ——, 115 S.Ct. 163, 130 L.Ed.2d 101 (1994). The Eighth Circuit found *Caputo*'s analysis persuasive in *United States v. Lloyd,* 43 F.3d 1183, 1187–88 (8th Cir.1994), and agreed that an Illinois sentence of conditional discharge qualifies as a "term of probation" under section 4A1.2(c)(1)(A). *See also United States v. Caswell*, 36 F.3d 29, 31 (7th Cir.1994) (equating Kentucky sentence of "90 days' incarceration, suspended on condition that defendant not commit any theft-related services in Kentucky for two years" with a "term of probation" for purposes of section 4A1.2(c)(1)(A)); *cf. United States v. Labella–Szuba*, 92 F.3d 136, 138 (2d Cir.1996) ("[E]very circuit that has compared a conditional discharge sentence to a sentence of unsupervised release has found them to be functionally equivalent."). *Caputo* dooms Damico's argument, and we are not persuaded by his diligent efforts to avoid its holding.

## C.

█ We shall make short work of Damico's final argument—a challenge to the district court's two-level upward departure to account for his involvement in organized crime. Damico does not dispute the fact of his involvement; indeed, he stipulated below that the government's proof on that point was sufficient and expressly waived his right to challenge the sufficiency of that evidence on appeal. (R. 267.) His argument, rather, is that section 2E1.1 factors a defendant's involvement in organized crime into the base level applicable to a RICO offense. According to Damico, then, a defendant's involvement in organized crime does not qualify as an aggravating circumstance "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines," making it an improper basis for upward departure. *See* U.S.S.G. § 5K2.0. We rejected the identical argument, however, in *United States v. Rainone*, 32 F.3d 1203, 1209 (7th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 2245, 132 L.Ed.2d 254 (1995), concluding that a defendant's involvement in organized crime is not reflected in the base offense level assigned to him under section 2E1.1. That is so regardless of whether the base offense level is established under subsection (a)(1) or (a)(2) of the RICO guideline, for neither the RICO statute nor the underlying offenses to which it applies are limited in application to defendants engaged in organized crime. Thus, when a nexus to organized crime exists, as it admittedly does here, it provides a proper basis for departure. *Rainone*, 32 F.3d at 1209.

AFFIRMED.