**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.

No. 99-4062

KERMIT C. BROWN, a/k/a Brian
Mackey, a/k/a Destruction, a/k/a
Bear,
<u>Defendant-Appellant.</u>

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.                                                              No. 99-4063

ROBERT CY MANN, a/k/a B,
<u>Defendant-Appellant.</u>

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.                                                              No. 99-4254

PERCELL A. DAVIS, a/k/a King,
<u>Defendant-Appellant.</u>

Appeals from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Raymond A. Jackson, District Judge.
(CR-98-47)

Argued: January 28, 2000

Decided: July 10, 2000

Before WIDENER, WILLIAMS, and MOTZ, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Mark McRoberts McMillin, THE BEREAN LAW GROUP, P.C., Norfolk, Virginia; Benjamin Thomas Reed, Norfolk, Virginia, for Appellants. Fernando Groene, Assistant United States Attorney, Darryl J. Mitchell, Assistant United States Attorney, Norfolk, Virginia, for Appellee. **ON BRIEF:** Douglas Fredericks, Norfolk, Virginia, for Appellant Brown. Helen F. Fahey, United States Attorney, Norfolk, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Robert Mann, Percell Davis, and Kermit Brown (collectively, Appellants) were convicted by a jury in the United States District Court for the Eastern District of Virginia of committing various federal narcotics and firearms violations arising out of a drug conspiracy of which Appellants were found to be members. Appellants jointly and individually assert several grounds for reversal on appeal, including that the district court erred in denying Appellants' Batson challenge; that the district court should have severed Mann's trial from that of his co-defendants; that Mann did not receive a fair trial because the jury heard evidence relating to a drug conspiracy in Maryland for which he had already been convicted; that the evidence did not support Mann's convictions; that the district court erred at

2

sentencing by incorrectly determining the date from which Davis became involved in the conspiracy; and that the district court erred in concluding that Davis was on probation during his involvement in the conspiracy. Finding no error, we affirm.

I.

Mann was a member of a drug conspiracy with, among others, Richard Thomas Stitt, Davis, and Brown, that existed in Virginia and other states (the Virginia conspiracy). In March 1996, Mann traveled to Maryland to buy cocaine for redistribution to Stitt, among others. Unbeknownst to Mann, however, the seller of this cocaine was cooperating with the police. On March 15, 1996, the police arrested Mann in Maryland and found several kilograms of cocaine on his person, as well as $53,050 in cash. Some or all of this money belonged to Stitt. The Government tried Mann in the United States District Court for the District of Maryland for, among other things, conspiracy to distribute drugs (the Maryland conspiracy). The indictment alleged that the Maryland conspiracy existed "[f]rom on or about December 1, 1995, until on or about March 16, 1996, in the State and District of Maryland and elsewhere." (J.A. at 183.) On February 23, 1997, Mann pleaded guilty to the Maryland conspiracy, and on June 17, 1997, he was sentenced to five years imprisonment.

On April 14, 1998, Mann, Davis, Brown, Stitt, and nine other co-defendants were named in a 31-count indictment in the United States District Court for the Eastern District of Virginia for various federal narcotics and firearm violations related to the Virginia conspiracy, which was alleged to have existed "[f]rom on or about 1990 . . . and continuously thereafter."[1] (J.A. at 95.) Mann was charged with involvement in the Virginia conspiracy, as well as for the substantive counts of possession with intent to distribute cocaine base, 21 U.S.C.A. § 841(a)(1) (West 1999) (Count 18), and distribution of cocaine base, 21 U.S.C.A. § 841(a)(1) (Count 25).[2] Davis was

_____

[1] Eight of the other nine co-defendants pleaded guilty, and the ninth remains a fugitive.
[2] Count 18 of the indictment alleged that "[i]n or about March 1995, in Portsmouth, Virginia," Mann, Stitt, and others "knowingly, intentionally,

3

charged with participating in the Virginia conspiracy, possession with intent to distribute cocaine base pursuant to 21 U.S.C.A. § 841(a)(1), distribution of cocaine base pursuant to 21 U.S.C.A.§ 841(a)(1), and murder. Brown was charged with several counts, including participation in the Virginia conspiracy, murder in furtherance of a criminal enterprise, use of a firearm during a crime of violence, and substantive drug offenses.[3] The Government tried Mann, Davis, Brown, and Stitt together.

On May 27, 1998, Mann filed a pretrial motion to sever his trial from that of his co-defendants. The motion to sever, which Stitt adopted and joined, argued that severance was appropriate because Mann would not be able to cross-examine his co-conspirators and because he would be generally prejudiced by having to stand trial with fellow co-conspirators. The motion to sever did not raise any double jeopardy arguments relating to the Maryland conspiracy.

On the same day, Mann also filed a motion in limine to exclude evidence of his Maryland conviction, arguing that Federal Rule of Evidence 404(b) barred such evidence. As with his motion for severance, Mann's motion in limine did not argue that double jeopardy was a basis for excluding the evidence. On June 23, 1998, at an oral hearing, the district court denied Mann's motion for severance and deferred ruling on the motion in limine.

At trial, which began on September 8, 1998, the Government offered evidence relating to Mann's substantive drug counts, as well as his involvement in the Virginia conspiracy. The evidence showed that Mann supplied crack to Stitt from the spring of 1995 to the spring of 1996. It also showed that Mann or his employees delivered crack

_____

and unlawfully possess[ed] with intent to distribute . . . cocaine base." (J.A. at 163.) Count 25 of the indictment alleged that "[i]n or about Summer 1995, in Portsmouth, Virginia," Mann "did knowingly, intentionally, and unlawfully distribute a quantity of a mixture of. . . cocaine." (J.A. at 169.)

**3** Because Brown's only ground for appeal is a Batson challenge that he shares with the other Appellants, we will not detail the facts relating to Brown.

4

to Stitt in restaurant parking lots, and that Mann assisted Stitt in redistributing cocaine to others through couriers. In addition, the Government offered Robert Flood as a witness. Flood, an associate of Stitt and Mann's, testified that he became aware in 1995 that Mann supplied drugs to Stitt for redistribution and that, in the spring of 1995, Flood personally received cocaine from Mann's courier. The Government also offered the testimony of Tyrone Wallace, another associate of Stitt and Mann's. Wallace testified that he saw Mann distribute drugs to Stitt.

On October 2, 1998, prior to the testimony of Police Detective Kriete, who was scheduled to testify about the Maryland conspiracy, Mann reiterated his objection to the admission of evidence relating to that conviction. Mann argued that Federal Rule of Evidence 404(b) prohibited admission of that evidence. He also argued, apparently for the first time, that the evidence of the Maryland conviction raised double jeopardy concerns. The district court denied Mann's motion to exclude evidence of the Maryland conviction and allowed Detective Kriete to testify about the March 1996 controlled drug buy in Maryland. On October 8, 1998, approximately one month after the beginning of trial, Mann filed a motion to dismiss the conspiracy charge against him on the basis of double jeopardy.

At trial, the Government also offered evidence relating to Davis's involvement in the Virginia conspiracy. Among the primary evidence against Davis was the testimony of his cousin, Jason Davis (Jason), who murdered Sinclair Simon on behalf of Stitt on October 27, 1994. Jason, who was a distributor and enforcer for Stitt, murdered Simon because Stitt was concerned that Simon would confess to his and Stitt's involvement in another murder. Jason testified that Davis went with him to meet Simon under the pretense of picking up drug proceeds. After Jason and Davis met Simon, Jason drove them to a location where drugs were supposed to be buried. Jason left the car with Simon, shot Simon, and then ran back to the car and ordered Davis to drive away. Davis drove back to Jason's house and helped him clean the vehicle after Jason informed Davis that he had killed Simon. Jason testified that Davis did not know beforehand that Jason planned to murder Simon. Another Government witness, Shawn Davis, testified that Davis had indicated to him that Davis was aware that Jason intended to kill Simon before it happened. The Government offered

5

this evidence to show that Davis was a member of the conspiracy in October 1994.

The jury found Mann guilty of conspiracy, possession with intent to distribute cocaine base, and distribution of cocaine base. The jury acquitted Davis of murder, but it found him guilty of conspiracy, possession with intent to distribute cocaine base, and distribution of cocaine base. The jury convicted Brown on all four counts with which he was charged.

Mann, Davis, and Brown were sentenced at separate hearings.[4] At sentencing, the district court granted Mann's motion to dismiss his conviction for the Virginia conspiracy count, finding that the Virginia conspiracy was the same as the Maryland conspiracy for which Mann was earlier convicted in 1997. The district court sentenced Mann to concurrent 252-month sentences on the remaining counts, to be served concurrently with his sentence for the Maryland conviction. The district court sentenced Davis to 432 months imprisonment on the conspiracy count and to concurrent 240-month sentences on the other counts. In arriving at Davis's sentence, the district court followed the recommendation from Davis's presentence report that he receive two additional criminal history points because Davis was under a criminal justice sentence during his participation in the conspiracy. The district court also added one criminal history point based upon Davis's prior misdemeanor conviction for failure to appear, which, according to the presentence report, subjected Davis to one year of unsupervised probation. Brown was sentenced to two life terms and 240 months imprisonment, each running concurrently, and sixty months imprisonment to run consecutively.

On appeal, Appellants jointly and individually raise several issues. Appellants argue that the district court erred in rejecting their Batson challenges. Mann argues that the district court erred in failing to sever his trial from that of his co-defendants,[5] and that he was prejudiced

_____

[4] Stitt, who is not a party to this appeal, was found guilty of several charges, including capital murder, and he was sentenced to death.
[5] Mann, in his brief and at oral argument, could not articulate how the district court's failure to sever the trial specifically prejudiced him. Consequently, at oral argument, we requested that Mann file a supplemental letter detailing exactly how he was prejudiced by the joint trial.

6

by the district court's decision to admit evidence related to his subsequent bad acts arising from the Maryland conspiracy for which he had already been convicted. Mann also argues that the evidence was so conflicted that no reasonable jury could have convicted him and that the district court erred at sentencing in determining the actual weight of the drugs that should be attributed to him pursuant to U.S. Sentencing Guidelines Manual § 2D1.1(c) (1998). Davis argues that the district court incorrectly determined the date that Davis began his involvement in the conspiracy, that the district court erred in adding one criminal history point based upon his misdemeanor conviction for failure to appear, and that the district court erred in concluding, pursuant to U.S.S.G. § 4A1.2, that Davis was under a criminal justice sentence during his participation in the conspiracy. We address each issue in turn.

II.

Appellants first argue that the district court erred in denying their Batson challenge. During jury selection, Appellants raised a Batson challenge based upon the Government's peremptory strikes, arguing that the Government struck a disproportionate number of black veniremen and that the Government's explanations for its strikes were not credible. We review a district court's denial of a Batson challenge under the clearly erroneous standard. See United States v. Grimmond, 137 F.3d 823, 833 (4th Cir.), cert. denied, 525 U.S. 850 (1998).

In asserting a Batson challenge, "[a] defendant has the burden of establishing a prima facie case of discrimination by the prosecutor in the selection of the jury. If the defendant makes a showing sufficient to infer discrimination, the burden shifts to the prosecutor to provide neutral explanations for his use of peremptory challenges."[6] United States v. Lane, 866 F.2d 103, 104 (4th Cir. 1989) (internal citations omitted). "If the prosecutor satisfies this requirement, the burden shifts back to the defendant to prove that the explanation given is a pretext for discrimination. The ultimate burden always rests with the opponent of the challenge to prove `purposeful discrimination.'" Grimmond, 137 F.3d at 834 (internal citations omitted). "The Govern-

_____

[6] In the present case, it is undisputed that Appellants established a prima facie case.

7

ment's explanation need not be persuasive, or even plausible, as long as it is neutral." Id. (internal quotation marks omitted). The proffered reason "need not be worthy of belief or related to the issues to be tried or to the prospective juror's ability to provide acceptable jury service." Jones v. Plaster, 57 F.3d 417, 420 (4th Cir. 1995).

In the present case, the jury panel had sixty-six individuals, of whom sixteen were black. The Government exercised twenty-two strikes, ten of which were used to strike black veniremen. Appellants made a Batson challenge, and the district court asked the Government to justify each of its strikes. The Government responded with explanations for its strikes, several of which are specifically contested in Appellants' brief.

The gist of Appellants' arguments is that the Government's explanations were not believable and that similarly situated white veniremen were not struck. The Government's strikes were based, among other things, upon two venireperson's problems with the death penalty, a venireperson's experience working with troubled children and teenagers, a spouse's employment in a correctional institution, a venireperson's previous addiction to drugs, a venireperson's quiet and soft-spoken demeanor, and addiction in a venireperson's family. Each of these reasons, on its face, is race-neutral. See Grimmond, 137 F.3d at 834 (upholding strike based upon the venireperson's age); Matthews v. Evatt, 105 F.3d 907, 918 (4th Cir. 1997) (rejecting Batson challenge even though the proffered reason -- equivocation about the venireperson's ability to impose the death penalty-- was shared by other venirepersons and even though all of the prosecutor's strikes were used on black persons); United States v. Bynum, 3 F.3d 769, 772 (4th Cir. 1993) (affirming district court's rejection of Batson challenge where the prosecutor's explanations were that a venireperson had the same last name as someone the prosecutor had prosecuted from the same town; that a venireperson was unemployed and had trouble with transportation to court; and that a venireperson was a young, single mother who might be too sympathetic with the defendant).

Appellants attempt to show pretext with respect to several of the strikes on the ground that similarly situated white veniremen were not struck. Although this type of discrepancy can be evidence of pretext,

8

it certainly does not, by itself, show pretext. See Matthews, 105 F.3d at 918 (stating that "Batson is not violated whenever two veniremen of different races provide the same responses and one is excused and the other is not"); Lane, 866 F.2d at 106 (rejecting argument that "the facially neutral reason was merely pretextual as evidenced by the fact that the prosecutor had earlier accepted a white female juror who, like Lucas, had not finished high school and had struck Robinson, who had 14 years of education"). The district court, which had the benefit of seeing the veniremen in person, and, thus, had the ability to assess the credibility of the Government's explanations, carefully scrutinized the Government's responses and concluded that they were not pretextual. On the record before us, we find no reason to disagree.[7]

III.

Mann argues on appeal that the district court abused its discretion in refusing to sever his trial from that of his co-defendants because, he asserts, he should not have been tried with members of a conspiracy for which he had already been convicted. Mann also argues that he was prejudiced by having to stand trial with Stitt, a capital murder defendant, against whom evidence of brutal murders was offered. We disagree.

The grant or denial of a motion for severance is within the sound discretion of the district court, and therefore, we review its decision for abuse of discretion. See United States v. Smith, 44 F.3d 1259,

_____

[7] Appellants argue that the district court appeared skeptical as to some of the Government's proffered explanations. The district court stated, for example, that two of the Government's strikes, which were each based upon opposition to the death penalty, were "marginal" because those jurors also indicated an ability to sit impartially. (J.A. at 356.) The district court stated that "[o]ut of all of these 22 strikes [the Government has] provided reasons for making these strikes. It's only maybe two of these strikes here that one might say they were marginal." (J.A. at 365.) The district court explained, however, that although these particular strikes were marginal, they nevertheless were supported by race neutral reasons. The district court explicitly found that Appellants had not shown pretext, stating that "I don't have any pretext or discrimination here, so I don't have a basis under Batson to strike or reverse your strikes." (J.A. at 366.) We cannot say that the district court clearly erred in this finding.

9

1267 (4th Cir. 1995); United States v. Santoni , 585 F.2d 667, 674 (4th Cir. 1978). Federal Rule of Criminal Procedure 14 provides that "the court may . . . grant a severance of defendants" if "it appears that a defendant or the government is prejudiced by a joinder of . . . defendants . . . for trial together." Fed. R. Crim. P. 14. However, "[b]arring special circumstances, individuals indicted together should be tried together." United States v. Brugman, 655 F.2d 540, 542 (4th Cir. 1981). There is a presumption that co-defendants indicted together will be tried together unless "a joint trial would be so unfairly prejudicial that a miscarriage of justice would result." United States v. Williams, 10 F.3d 1070, 1080 (4th Cir. 1993). In applying this presumption, the mere fact that evidence against one or more defendants is stronger or more inflammatory than the evidence against other defendants does not warrant severance. See United States v. Hall, 93 F.3d 126, 131 (4th Cir. 1996). Moreover, "[a] defendant making a motion for severance pursuant to Rule 14 has the burden of demonstrating a strong showing of prejudice, and it is not enough to simply show that joinder makes for a more difficult defense." United States v. Goldman, 750 F.2d 1221, 1225 (4th Cir. 1984) (internal citations omitted).

In the present case, Mann argues that he was prejudiced because most of the evidence offered at trial -- including evidence relating to his Maryland conviction, evidence of drug transactions in which he was not a participant, and evidence relating to Stitt's capital murder charges -- would not have been admissible against him had the district court severed the trial. Our examination of the record, however, leads us to the conclusion that the district court did not abuse its discretion in refusing to sever the trial.[8] As noted above, "[a] defendant

_____

[8] Mann also contends that the district court erred in refusing to sever the trial from the beginning on double jeopardy grounds. We note, however, that this was not a situation in which the district court simply ignored the double jeopardy issue from the outset in refusing to sever the trial. Indeed, Mann did not raise the double jeopardy issue until well after the trial had already begun and over four months after filing his motion to sever. Mann's arguments for severance, both in his motion and at the oral hearing before the district court, relied only upon generalized notions of prejudice stemming from having to stand trial with co-conspirators, and not from any specific prejudice arising from double

10

making a motion for severance pursuant to Rule 14 has the burden of demonstrating a strong showing of prejudice." [9] Goldman, 750 F.2d at 1225. Mann fails to satisfy this burden because there is no indication that the jury could not compartmentalize the evidence as it related to the different defendants. See United States v. Ford, 88 F.3d 1350, 1361 (4th Cir. 1996). To the contrary, the jury's ability to evaluate the separate evidence against each co-defendant was demonstrated by its acquittal of Davis on the murder count. See id. (concluding that the jury "demonstrated its ability to sift through the evidence and draw conclusions based on the evidence relevant to each defendant" when it acquitted some defendants on some counts). Moreover, the district court explicitly instructed the jury that in order to convict Mann on

_____

jeopardy grounds. Although "the trial judge has a continuing duty at all stages of the trial to grant a severance if prejudice does appear," Schaffer v. United States, 362 U.S. 511, 516 (1960), it is difficult to say that the district court abused its discretion in weighing concerns of judicial economy, along with the normal presumption of a joint trial, against Mann's burden to show specific prejudice when Mann did not articulate any specific prejudice until after the fact, and, indeed, has struggled to do so even on appeal.

[9] To the extent that Mann argues that the mere fact that the conspiracy count against him was subsequently dismissed automatically shows that severance was warranted because of the inherently prejudicial nature of the proceedings, we disagree. Absent a showing of actual prejudice, the mere fact of a subsequent dismissal of a conspiracy count, standing alone, does not necessarily call for severance. We have previously affirmed substantive convictions following the dismissal of a conspiracy count after the start of trial. See United States v. Jarvis, 7 F.3d 404, 413-15 (4th Cir. 1993) (concluding that conspiracy prosecution against Jarvis constituted double jeopardy but, nevertheless, affirming the defendant's remaining convictions on substantive drug offenses); see also Schaffer v. United States, 362 U.S. 511, 513-14 (1960) (affirming district court's refusal to sever trial after conspiracy count was dismissed for failure of proof before submission to the jury because appellants could not show prejudice); cf. United States v. Ford, 88 F.3d 1350, 1361 (4th Cir. 1996) (affirming district court's refusal to sever trial after jury acquitted defendants on conspiracy charge because there was sufficient evidence for the jury to consider the conspiracy count and there was no evidence that the jury could not compartmentalize the evidence as it related to the different defendants).

11

the substantive drug counts, the Government had to prove each of the essential elements of those counts beyond a reasonable doubt. See Zafiro v. United States, 506 U.S. 534, 540-41 (1993) (concluding that the district court did not abuse its discretion in denying severance where, among other things, appellants could not show specific prejudice and the district court "properly instructed the jury that the Government had the burden of proving beyond a reasonable doubt that each defendant committed the crimes with which he or she was charged" (internal quotation marks omitted)). Mann has not given us any reason to believe that the jury disregarded this instruction by improperly considering Stitt's capital charges or the separate conspiracy count against Mann when it convicted Mann on the substantive counts.[10] See Weeks v. Angelone, 120 S. Ct. 727, 733 (2000) ("A jury is presumed to follow its instructions.").

Accordingly, because there is no indication in the record that the jury could not separate the evidence relating to the capital case against Stitt from the substantive drug offenses against Mann, we cannot conclude that Mann was unfairly prejudiced from having to stand trial with his co-defendants.[11] We, therefore, conclude that the district court did not abuse its discretion in refusing to sever the trial.

_____

[10] Mann also fails to articulate any actual prejudice that he suffered from having to stand trial with a capital co-defendant. Mann relies, instead, upon broad arguments concerning the generally prejudicial nature of a capital trial. We decline to adopt a per se rule, as Mann appears to seek, that every trial involving both capital and non-capital defendants is so inherently prejudicial as to warrant severance even absent a showing of any specific prejudice. Cf. United States v. Tipton, 90 F.3d 861, 868 n.1 (4th Cir. 1996) (noting that co-defendant Sandra Reavis, a non-capital defendant, was tried together with capital defendants Tipton, Johnson, and Roane); United States v. Reavis, 48 F.3d 763, 766-68 (4th Cir. 1995) (affirming district court's refusal to sever trial of Sandra Reavis from that of co-defendants Tipton, Johnson, and Roane on the basis that Roane would have offered favorable testimony at a separate trial because Reavis failed to make an "affirmative demonstration that she was deprived of a fair trial by the denial of her severance motion").

[11] Mann maintains that severance was appropriate because "conservatively some 90-95% of the evidence was inadmissible as to Mann, were

12

IV.

Mann next argues that the district court erred by admitting evidence related to his Maryland conviction pursuant to Federal Rule of

_____

he being tried on only the substantive counts without the conspiracy." (Appellant's Br. at 27.) See Zafiro v. United States, 506 U.S. 534, 539 (1993) (recognizing that a risk of prejudice "might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant"). Mann, however, overstates his case. Indeed, much of the evidence supporting his substantive convictions would have been admissible against him at a separate trial, including Flood's testimony that Flood received cocaine from Mann's courier in the spring of 1995; Wallace's testimony that at some point in 1995, he saw Mann give Stitt a duffel bag that contained two "keys" of cocaine (J.A. at 729.); Ivan Harris's testimony that he, Stitt, Flood, and Sam Hucks went to a go-go bar to procure drugs, and that Harris observed Mann give Stitt a bag full of cocaine base; and Jason Ortega's testimony that Mann and Stitt taught him how to "cook" cocaine powder into cocaine base. Likewise, the evidence relating to the Maryland conspiracy would also have been admissible at a separate trial. See infra part IV (concluding that the district court did not err in admitting evidence against Mann relating to the Maryland conspiracy). Accordingly, we cannot agree with Mann's assertion that he was unfairly prejudiced by the admission of most of the evidence against him at his joint trial.

Mann, in his supplemental letter, lists both Harris's and Flood's testimony as "evidence which counsel for Mr. Mann believes would not have been admitted into evidence at trial had this case been severed at trial from that of the co-defendants." (Letter from Mark M. McMillin to this Court, dated Feb. 1, 2000.) However, Mann does not articulate any reason why this evidence would be inadmissible at a separate trial, nor can we see any basis from which to exclude this evidence. Even if we construed Mann's laundry-list reference to this evidence as asserting Federal Rule of Evidence 404(b) as a ground for exclusion, we believe that the evidence would be admissible, and, indeed, would not be Rule 404(b) evidence at all, because it constitutes direct evidence of the conduct charged. We also note that Mann's letter does not challenge Wallace's testimony concerning the cocaine in the duffel bag or Ortega's testimony that Mann and Stitt taught Ortega how to cook powder cocaine into cocaine base.

13

Evidence 404 because, he asserts, subsequent bad-act evidence is inadmissible. Mann also contends that the district court erred because the Government offered evidence relating to his Maryland conviction only for the improper purpose of showing Mann's bad character. The Government responds that it offered the evidence not as character evidence, but as evidence of the agreement and relationship between Mann and Stitt that was intrinsic to the charged offenses. The Government also argues that the evidence is of prior bad acts, rather than subsequent bad acts, because the conspiracy continued beyond the time period of the Maryland conviction, and, in any case, that evidence of subsequent bad acts is admissible.

We review the district court's admission of evidence pursuant to Federal Rule of Evidence 404 for abuse of discretion. See United States v. Powers, 59 F.3d 1460, 1469 (4th Cir. 1995). Federal Rule of Evidence 404 permits the admission of "[e]vidence of other crimes, wrongs, or acts" for purposes other than "to prove the character of a person in order to show action in conformity therewith," such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b). The district court admitted the evidence of Mann's Maryland conviction, concluding that "it's relevant, it's probative. It may be introduced to show the state of mind, plan, pattern, any number of things here, so the court can't find any plausible reason to exclude the testimony." (Tr. at 3991.)

We have stated that Rule 404(b) evidence is admissible under the following circumstances:

> [W]e hold that evidence of prior acts becomes admissible under Rules 404(b) and 403 if it meets the following criteria: (1) the evidence must be relevant to an issue, such as an element of an offense, and must not be offered to establish the general character of the defendant. In this regard, the more similar the prior act is (in terms of physical similarity or mental state) to the act being proved, the more relevant it becomes. (2) The act must be necessary in the sense that it is probative of an essential claim or an element of the offense. (3) The evidence must be reliable. And (4)

14

> the evidence's probative value must not be substantially out-weighed by confusion or unfair prejudice . . . .

United States v. Queen, 132 F.3d 991, 997 (4th Cir. 1997).[12] We conclude that the Government properly articulated a basis for admitting the evidence in question. In the present case, the Government offered evidence that Mann traveled to Maryland in March 1996 with Stitt's money to buy drugs on behalf of Stitt. This evidence was relevant to the substantive drug counts because it established, among other things, Mann's knowledge and intent to distribute drugs. See United States v. Whaley, 786 F.2d 1229, 1232 (4th Cir. 1986) ("The mere fact that the `other acts' at issue occurred after the events charged in the indictment does not render them irrelevant . . . . Subsequent conduct may be highly probative of prior intent. That one has thought in a particular illegal way over a period of time is evidence that one's thought patterns had already been so developed and were so operating on another previous occasion."). We have little difficulty concluding that the evidence relating to Mann's Maryland conviction was probative and that it was not offered for the impermissible purpose of showing Mann's bad character. Likewise, this evidence was essential to establish the elements of Mann's substantive drug charges, which alleged that Mann "knowingly" and "intentionally" possessed and distributed drugs.[13] This is particularly true in light of Mann's efforts to portray himself as merely a friend of Stitt's who did not participate in any drug deals. (See, e.g., Appellant's Br. at 35 (arguing that "Mann only sold cars to Stitt and was not part of his drug business"); 12 (arguing that although Mann received a large amount of cash in a shoebox, Mann did not look to see what was in the box).) Nor can we say that the district court abused its discretion in determining that the probative value of this evidence was not substantially outweighed by its

_____

[12] Seizing upon our use of the word "prior acts" in describing Rule 404(b) admissibility, Mann argues that Rule 404(b) does not permit evidence of subsequent acts. However, on several other occasions, we have admitted evidence of subsequent bad acts and not just prior bad acts. See United States v. Whaley, 786 F.2d 1229, 1232 (4th Cir. 1986); United States v. Hadaway, 681 F.2d 214, 217-18 (4th Cir. 1982).

[13] Mann does not contest the reliability of the evidence. (See Tr. at 3987 (Mann's counsel, stating that "[t]here's no question it would be reliable").)

15

prejudicial nature. Having reviewed the record, and given the highly probative nature of this evidence, we cannot conclude that the district court abused its discretion in allowing the Government to present this evidence.

V.

Mann also argues that the evidence was so conflicted that no reasonable jury could have convicted him. In essence, Mann argues that there was insufficient evidence to sustain his convictions because there was contradictory evidence. In reviewing the sufficiency of the evidence against Mann, we will sustain the verdict "if there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser v. United States, 315 U.S. 60, 80 (1942). "[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996) (en banc).

In the present case, there was substantial evidence to support Mann's convictions. Flood testified, for example, that he became aware in 1995 that Mann supplied drugs to Stitt for redistribution and that, in the spring of 1995, Flood received cocaine from Mann's courier. Similarly, Wallace testified that at some point in 1995, he saw Mann give Stitt a duffel bag that contained two "keys" of cocaine. (J.A. at 729.) Ivan Harris testified that, in the summer of 1995, he, Stitt, Flood, and Sam Hucks went to a go-go bar to procure drugs, and that Harris observed Mann give Stitt a bag full of cocaine base. And, Jason Ortega testified that Mann and Stitt taught him how to "cook" cocaine powder into cocaine base. Viewing this evidence in the light most favorable to the Government, we find meritless Mann's argument that this evidence is insufficient to support his convictions.

VI.

Finally, Mann argues that the district court erred in attributing 1.5 kilograms of cocaine base to Mann under Count 18 and ten kilograms of cocaine under Count 25 for purposes of setting Mann's base offense level pursuant to U.S.S.G. § 2D1.1. We review the district court's findings under the clearly erroneous standard. See United

16

States v. Daughtrey, 874 F.2d 213, 217 (4th Cir. 1989). In reviewing the district court's application of the Sentencing Guidelines, we give "due regard to the opportunity of the district court to judge the credibility of witnesses." 18 U.S.C.A. § 3742(e) (West Supp. 2000).

In the present case, Detective Tammy Early testified at Mann's sentencing that Mann should be responsible for 1.5 kilograms of cocaine base for Count 18 and ten kilograms of cocaine for Count 25. The district court attributed these amounts to Mann, overruling Mann's objection. The district court made explicit findings and described its reasoning. For example, with respect to Count 18, it stated that

> [t]he court finds that a minimum of three kilograms were involved in the possession with intent to distribute in count 18. The court does, in fact, credit the testimony that in March 1995 on at least three separate occasions this defendant was involved in the possession with intent to distribute of at least three kilograms of crack cocaine.
>
> The government is taking the most conservative view of the matters here. But even a more conservative view of the testimony is that at least 1.5 kilograms were in fact possessed with intent to distribute. The record reflects far more than that. The presentence report in paragraph 102 reflects at least nine kilograms of crack cocaine involved. Taking the most conservative view, the court would find as a matter of fact that at least 1.5 kilograms or more were certainly involved in the possession with intent to distribute on that occasion.

(J.A. at 778-79.) The district court also made explicit findings with respect to Count 25 in attributing ten kilograms of cocaine to Mann. Our reading of the sentencing transcript indicates that the court clearly considered the testimony of the case agent at the sentencing hearing, heard all of the evidence and testimony at trial, and examined the presentence report before making its factual findings. For that reason, we cannot conclude that the district court clearly erred in its findings as to the relevant drug weights attributable to Mann.[14]

_____

[14] Mann, in his brief, does not articulate why or how the district court might have erred in its findings. He also does not point to any contrary evidence that would support a lesser amount of drugs.

17

Accordingly, we affirm the district court's findings regarding drug amounts attributable to Mann.**15**

VII.

Davis argues on appeal that there is no evidence that he was a member of the conspiracy before April 1995. In particular, Davis argues that the district court erred at sentencing in concluding that he was a member of the conspiracy in October 1994 based upon his participation in Simon's murder because the evidence showed that Davis was unaware that his cousin, Jason, would murder Simon until it happened. Davis concedes that he was present during that murder and that he drove Jason from the murder and helped Jason clean the car after the murder. He argues, however, that he did not know about the murder beforehand, and that even if he had, mere presence and consent is not enough to sustain his participation in the conspiracy. The Government responds that the evidence establishes that Davis helped Jason murder Simon on behalf of Stitt in October 1994 and that this constitutes participation in the conspiracy. We affirm the district court's finding that Davis was a member of the conspiracy in October 1994.

We review the district court's factual findings under the clearly erroneous standard. See United States v. Daughtrey, 874 F.2d 213, 217 (4th Cir. 1989). In reviewing the district court's application of the Sentencing Guidelines, we give "due regard to the opportunity of the district court to judge the credibility of witnesses." 18 U.S.C.A. § 3742(e) (West Supp. 2000). The district court stated that

_____

**15** Mann appears to argue that the district court was collaterally estopped by the Maryland court's findings as to drug weights for the relevant conduct, and, therefore, the district court was bound by the Maryland court's findings as to drug weights. Mann does not, however, articulate what the Maryland court's findings were as to drug weights, nor does he indicate how the district court's findings are different from the Maryland court's findings or how the result might be different if we accepted the Maryland court's findings. Moreover, it does not appear that Mann raised the collateral estoppel issue below. (J.A. at 1063 (describing, in presentence report, Mann's objections to drug weight as "all the amounts of drug weights were simply erroneous and unsupported by the evidence").)

18

> [t]he court would find that the defendant was a participant in this conspiracy as early as October 27th, 1994. The court has already previously made a finding that the court didn't find the defendant credible with respect to his role in the Sinclair Simon murder. So the court would find that as early as October 27th, 1994 he was a participant, and continuously thereafter during these periods of probation he was involved in this conspiracy. The court believes that is supported by the testimony in the record regarding the various violent acts that took place, his participation in driving Mr. Davis around.

(J.A. at 928.)

The relevant testimony on this issue came from two witnesses, Jason and Shawn Davis. Jason testified that he, Davis, and Simon drove out to the railroad tracks and that he and Simon left the car purportedly to dig for buried drugs. Jason shot Simon, got back in the car where Davis was waiting, and they drove off. Jason testified that Davis asked where Simon was, and that Jason told Davis that he killed him. Upon reaching Jason's home, Davis and Jason cleaned the inside of the truck, removing paper, bottles and other trash. Shawn testified that Jason and Davis visited him while he was in prison and that Davis told Shawn about Simon's death. Davis indicated to Shawn that he was aware that Jason intended to kill Simon before Jason pulled the trigger, that Davis witnessed the murder, and that he and Jason drove away from the murder scene together.

Based upon Jason and Shawn's testimony, it is undisputed that Davis was present at the murder, that he drove Jason from the murder scene after being told about the murder, that he helped Jason clean the car after the murder, and that Jason committed the murder on behalf of Stitt and the conspiracy. Moreover, Jason's testimony suggests that even if Davis was otherwise unaware of the pending murder, he at least believed that he, Jason, and Simon were driving out to retrieve drug money. (See J.A. at 508 ("I told[Simon that they were going] to pick up some drug money" while Davis was in the back seat.).) And, Shawn testified that Davis told him that he knew about the murder in advance. From this testimony, the district court had a sufficient basis from which to conclude that Davis knew about the murder in

19

advance, that he helped Jason commit the murder by driving him away from the murder scene, and that this incident constituted an overt act in furtherance of the conspiracy as of October 27, 1994. Thus, although "mere knowledge, acquiescence, or approval of a crime is not enough to establish that an individual is part of a conspiracy to distribute drugs," nor is "mere presence at the scene of a distribution of drugs" sufficient, United States v. Pupo, 841 F.2d 1235, 1238 (4th Cir.1988) (en banc), the district court did not clearly err in finding that Davis's version of events was not credible and that Davis's conduct was "more consistent with participation than [it was] with mere acquiescence," id. (stating that the jury could have properly concluded that the defendant participated in the conspiracy when the evidence showed that he carried a tote bag that contained drugs and remained in a motel room with a co-conspirator for three days until they received a call informing them that the transaction was complete).

VIII.

Davis next argues that the district court erred in concluding that he was on a term of probation as a result of his May 3, 1996 misdemeanor conviction for failure to appear. Davis's sentence reflects a Criminal History Category III, with four criminal history points.[16] The district court gave Davis one criminal history point for each of his prior convictions for attempted grand larceny and failure to appear, and two additional criminal history points based upon the fact that Davis was under a criminal justice sentence during his participation in the conspiracy. Davis argues that the district court erred in giving him a criminal history point based upon his prior misdemeanor conviction for failure to appear because, although he was on a twelve-month term of "good behavior" as a result of that conviction, he was not under a term of probation that would enable the conviction to be counted against him under U.S.S.G. § 4A1.2(c). Therefore, Davis asserts, his sentence should reflect only three criminal history points, rather than four, and his Criminal History Category should be lowered to Category II.

_____

[16] The original presentence report reflected five criminal history points, but it was later revised to reflect only four points.

Section 4A1.2 of the Sentencing Guidelines provides that sentences for some prior convictions, such as contempt of court or failure to appear, are counted for guideline purposes only if "the sentence was a term of probation of at least one year or a term of imprisonment of at least thirty days." U.S.S.G. § 4A1.2(c)(1). In the present case, the district court adopted the presentence report's conclusion that Davis was subject to "$50 fine, $29 costs, 60 days suspended with 12 months good behavior" as a result of his conviction for failure to appear, and, therefore, that Davis was under a "term of probation" for purposes of § 4A1.2. (J.A. at 973.) Davis objected, arguing that "good behavior" is not the same as probation.[17] We review questions involving the legal interpretation of the Sentencing Guidelines de novo. See United States v. France, 164 F.3d 203, 209 (4th Cir. 1998), cert. denied, 527 U.S. 1010 (1999).

The issue before us is whether a "good behavior" requirement imposed as a result of a suspended sentence for a misdemeanor conviction is a "term of probation" for purposes of U.S.S.G. § 4A1.2. Under Virginia law, "the court may suspend imposition of sentence or suspend the sentence in whole or part and in addition may place the accused on probation under such conditions as the court shall determine." Va. Code. Ann. § 19.2-303 (Michie 1995). The court "may at any time before the sentence has been completely served," suspend the sentence, place the person on probation, or otherwise modify the sentence. Id. Virginia law also allows the trial court to revoke a suspended sentence for any act that occurs within the probation period, or, if no probation period is listed, within the period of suspension fixed by the court. See Va. Code Ann. § 19.2-306 (Michie 1995). If no period of suspension is fixed by the court, then the trial court may revoke the suspended sentence "within the maximum period for which the defendant might originally have been sentenced to be imprisoned." Id. For a Class I misdemeanor such as failure to

_____

[17] Davis offered a certified copy of his conviction, in which the box marked "probation" is not checked; rather, the form states simply that Davis is sentenced to a $50 fine and a sixty-day suspended sentence "conditioned upon being of good behavior and keeping the peace." (J.A. at 219.) The form does not state when the suspension of the sentence will end, nor does it describe the length of the "good behavior" requirement.

21

appear, the maximum period of imprisonment is one year. <u>See</u> Va. Code Ann. § 18.2-11 (Michie 1996).

Davis argues that Virginia law distinguishes between a suspension of sentence and probation, and, therefore, a suspended sentence, standing alone, is not a "term of probation" for purposes of § 4A1.2. It is true that Virginia law treats a suspension of sentence as a distinct concept from probation. <u>See</u> Va. Code Ann. § 19.2-303 (providing that the court may suspend a sentence and may also place the defendant on probation). However, the Supreme Court of Virginia, in <u>Dyke v. Commonwealth</u>, 69 S.E.2d 483 (Va. 1952), has previously indicated that a suspended sentence predicated upon "good behavior" is functionally the same as unsupervised probation. **18** <u>See id.</u> at 486 (recognizing that "a distinction is made in both sections 53-273 and 53-275 between suspension of sentence and probation [because a] [s]entence may be suspended without putting the defendant on probation," but noting that "terms and conditions [such as requiring good behavior as a condition of a suspended sentence] are probation . . . in the sense that they require the defendant to observe a specified course of conduct; but they are not the supervised probation referred to in the statute"); <u>cf. Anderson v. Commonwealth</u>, 490 S.E.2d 274, 277 (Va. Ct. App. 1997) (stating that although "[t]he law of Virginia distinguishes the suspension of a sentence from the imposition of probation . . . the conditions imposed in probation and those imposed in the suspension of sentences need not be analyzed in different contexts. The common objective of such conditions is to protect society and to promote rehabilitation of the convict. Both probation and the

_____

**18** In <u>Dyke v. Commonwealth</u>, 69 S.E.2d 483 (Va. 1952), the Supreme Court of Virginia addressed whether the trial court had jurisdiction to revoke the suspension of a sentence based upon the defendant's conviction within twelve months of the suspension where the suspension was conditioned upon good behavior but did not expressly require probation or describe the length of the "good behavior" requirement. <u>See id.</u> at 484. <u>Dyke</u> involved an interpretation of Va. Code § 53-272, the predecessor statute to § 19.2-303. <u>See Singleton v. Commonwealth</u>, 400 S.E.2d 205, 207 (Va. Ct. App. 1991) (noting that § 19.2-303 replaced § 53-272). Section 53-272 provided that the trial court "may suspend the imposition or the execution of the sentence . . . and may also place the defendant on probation under the supervision of a probation officer." <u>Dyke</u>, 69 S.E.2d at 484.

22

suspension of a sentence involve the trial court's discretionary, and conditional, release of a convict from the service of a sentence within the penal system.").

Other courts, addressing the very issue before us, have concluded that a sentence of unsupervised conditional release, predicated upon good behavior, constitutes a term of unsupervised probation for purposes of § 4A1.2, notwithstanding the absence of specific language in the release referring to a term of probation. See Harris v. United States, 204 F.3d 681, 682 (6th Cir. 2000) (noting that "[a]lthough Mr. Harris was not sentenced to supervised probation, he was sentenced to" a suspended sentence that was conditioned upon no further convictions, and stating that this form of conditional discharge "is the functional equivalent of unsupervised probation" (internal quotation marks omitted)); United States v. Labella-Szuba , 92 F.3d 136, 138 (2d Cir. 1996) (stating that "[a]lthough defendant's sentence did not include active supervision, her sentence did include a supervisory component in that [the court] retained the power to revoke her conditional discharge sentence" and, thus, her conditional discharge was the functional equivalent to unsupervised probation); United States v. Caputo, 978 F.2d 972, 976-77 (7th Cir. 1992) (stating that "[p]robation means that the convicted defendant is not incarcerated but must comply with various conditions set by the sentencing court and monitored by a probation officer. . . . Conditional discharge is the same except that there is no probation officer. . . . It is probation without the probation officer and that is a distinction without a difference so far as the purposes of the guideline exception is concerned").[19] But cf. United States v. Johnson, 43 F.3d 1211, 1216 (8th Cir. 1995) (concluding that a stay of imposition of sentence conditioned upon the avoidance of similar offenses under Minnesota law is not the same as probation because "[a] stay of imposition of sentence with an attendant term of either supervised or unsupervised probation is certainly

_____

[19] Illinois law, which was at issue in United States v. Caputo, 978 F.2d 972 (7th Cir. 1992), defines conditional discharge as a "`conditional and revocable release without probationary supervision but under such conditions as may be imposed by the court.'" United States v. Miller, 56 F.3d 719, 721 n.1 (6th Cir. 1995) (quoting Ill. Rev. Stat. ch. 38, para 1005-1-4 (1989)).

23

a more exacting penalty than a like sentence without a term of probation due to the additional probationary restrictions").

In the present case, it is undisputed that Davis's suspended sentence was revocable if he failed to satisfy the condition of "good

behavior" at any time within twelve months of his conviction for failure to appear. Although his sentence did not refer explicitly to a term of probation, we agree that Davis's twelve-month "good behavior" requirement is the functional equivalent to a term of unsupervised probation. We, therefore, conclude that the district court did not err in giving Davis a criminal history point based upon his conviction for failure to appear.[20]

IX.

For the reasons discussed, we find no error at the trial or sentencing phases of the criminal proceedings against Appellants. We therefore affirm Appellants' convictions and sentences.

AFFIRMED
_____

[20] Davis also argues that, because his involvement in the conspiracy did not begin in October 1994 and because his conviction for failure to appear does not count as a prior sentence under U.S.S.G. § 4A1.2, the district court erred in giving him two additional criminal history points for being under a criminal justice sentence during his involvement in the conspiracy. As noted above, however, see supra part VII, we have concluded that the district court did not err in finding that Davis became involved in the conspiracy in October 1994, only five months after his May 4, 1994 conviction for attempted grand larceny. Thus, Davis was still under a term of probation -- and, therefore, a criminal justice sentence -- during his involvement in the conspiracy.

24